IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00098-CMA-GPG

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. **MEGAN HESS**,
2. SHIRLEY KOCH,

    Defendants.

---

### GOVERNMENT'S SENTENCING STATEMENT AS TO DEFENDANT MEGAN HESS

---

The United States of America hereby files its Sentencing Statement as to Defendant Megan Hess.

### Summary of Government's Position

The Presentence Report [#251] ("PSR") calculates that Hess's projected advisory guideline range is 151 to 188 months imprisonment. PSR, ¶ 127. The Probation Office submits that the sentencing factors support an upward variance and recommends 240 months of imprisonment (i.e., the statutory maximum of 20 years). [#251-2, PSR, Exhibit A, R-1 to R-5]. In the parties' plea agreement, the Government similarly calculated the Defendant's guideline range to be 151 to 188 months imprisonment (assuming a total offense level of 34 and a criminal history category 1). [#230, p. 20].

1

Applying the sentencing criteria of 18 U.S.C. § 3553(a), the Government urges the Court to sentence the Defendant to the high end of the advisory guideline sentencing range as calculated by the Government. Specifically, the Government recommends a **188 month sentence to imprisonment** to be followed by 3 years of supervised release.

## Sentencing Factors – 18 U.S.C. § 3553(a)

*Nature and Circumstances of the Offense*

The PSR provides a thorough and detailed outline of the overall nature of the relevant conduct and the offense of conviction – mail fraud and aiding and abetting. PSR, ¶¶ 6-56[1]. Several points are worth noting in addition to the detailed factual background already presented to the Court within the PSR.

<u>Harm Caused to Others</u>

When evaluating the nature of the offense conduct, it is important to keep in mind the multiple ways in which Hess and Koch's scheme harmed others.

First, the scheme defrauded numerous victims of monetary funds. Put simply, the Defendants knowingly failed to provide hundreds of victims and their families a contractually promised cremation. Instead, the victims paid hundreds or thousands of dollars for cremation services which the Defendants consistently failed to provide.

---

[1] In the parties' plea agreement [#230, p. 3], the Defendant specifically stipulated that the information contained within paragraphs nos. 7 to 32 of the PSR are "facts" which are "true and correct". *Id.* Accordingly, when ruling on any sentencing disputes as to offense specific characteristics, the Court may accept any of the information contained within these particular paragraphs as proven facts which may be relied upon without further hearing or evidence.

Hess and her mother often lied to the victims and next of kin by providing cremains which were not from the families' decedent.   In this respect, the crime was a classic "bait and switch swindle".    As a result, the Defendants' business, Sunset Mesa Funeral Foundation, Inc., reaped an unjust financial windfall for services which it never rendered -- all to the economic detriment of the victims.

Second, beyond swindling the victims out of their money, the Defendants also worked together to steal the bodies of their victims, ultimately inflicting trauma on the families who were left behind.   In this respect, this case is far worse than a routine fraud case.   Specifically, Hess formed Donor Services in 2009 which she used as a body broker service involved in the harvesting of human body parts.   Koch played an integral role in the harvesting of the human body parts through Donor Services as she was typically the person responsible for recovering the heads, torsos, arms, legs or in some cases human bodies. PSR, ¶ 8.   As detailed in the PSR, Hess and Koch -- despite lacking any authorization whatsoever … recovered body parts from, or otherwise prepared entire bodies of, hundreds of decedents for body broker services. PSR, ¶¶ 11-12.    In some cases, families did authorize a donation. ¶ 12.   However, such authorizations oftentimes were based on misrepresentations made by Hess or Koch. *Id.*   In many instances the families would not have authorized donation had they been informed of what would actually be done with their loved one's remains. *Id.*   To the horror of some of the victims, they later learned from law enforcement that their loved ones' body had been sold on the secondary market and that the cremains which

3

they were holding did not in fact belong to their deceased family member.

Third, defendant Hess advertised to customers that the remains offered for sale by Donor Services were legitimately and freely donated when that often was not the case. PSR, ¶ 13.  To carry out this portion of the fraud scheme, Hess fraudulently created donor authorization forms which concealed the fact that the bodies were stolen. *Id.*  Later, Hess sold the stolen body parts to customers while falsely representing to the customers that the body parts had been donated instead of stolen. PSR, ¶ 16. Hess and Koch then packaged and arranged for interstate shipment of the bodies to customers.  PSR, ¶ 18.  Ultimately, a number of the customers purchasing the remains from Donor Services were deceived because they relied on the misrepresentations that the remains were legitimately donated. PSR, ¶ 16.   Such customers indicated that they would not have purchased the remains had they known the bodies were stolen. *Id.*

Fourth, the customers buying the body parts were also deceived by Hess and Koch as they understood that the remains which they were purchasing were free of particular infectious diseases, namely HIV and hepatitis. PSR, ¶ 17.   Hess forged laboratory reports which falsely indicated to the customers that the remains tested negative for infectious diseases. *Id.*   As a result, the customers who purchased the remains – and the carriers who transported the remains – were recklessly exposed to hazardous materials in a number of instances. PSR, ¶ ¶ 17, 18.

Finally, and perhaps most importantly, Hess and Koch's conduct caused immense emotional pain for the families and next of kin.   The Defendants' actions

4

resulted in unwarranted trauma and emotional distress for an untold number of victims at a time when many were still grieving the loss of a loved one.    The Government cannot adequately describe the pain and disrespect which the crime inflicted upon the victims.   It is impossible for the Government to fully capture in words the extent of the victims' pain as it is incalculable in depth and scope.   Rather, the multiple victim impact statements submitted to the Court provide the best description of the damage caused by the crime along with the range of emotions felt by the victims which includes, despair, disbelief, betrayal, anger, vengeance, sadness, frustration, grief, etc… [#251, PSR, Exhibits C, D, and E].   Regrettably for many of the victims, the wounds caused by the indignities of the offense have been so great that it has been difficult for them to move on in their lives.   Some victims have described suffering physical and medical infirmities due to the offense.   In addition, a number of the victims have actually received counseling and therapy in the aftermath.

In sum, the harmful toll caused by Hess's conduct has been enormous and immeasurable.   The negative financial, emotional, and health consequences for the victims from the offense must be taken into account at sentencing in order for there to be any justice in this case.

### Hess's Leadership Role in the Offense

As set forth in the PSR, Hess played a central leadership role in the operation of the two businesses.   Specifically, Hess "handled most aspects of Sunset Mesa Funeral Directors and Donor Service and managed the activities of others involved in the

businesses, including her co-defendant Koch.   As part of these operations, the defendant personally met with individuals and families seeking funeral services.   The defendant also handled most of the advertising, invoicing, and shipping for Donor Services, and dealt with the body broker services customers." PSR, ¶ 9.   Hess was responsible for devising key stratagems used during the fraud, including developing the bogus "donor authorization forms", forging false laboratory reports, and tricking victims' families into believing their loved ones wanted their bodies donated because organ donor was checked on the decedent's driver's license. PSR, ¶ ¶ 13, 17, 20.

During one phase of the scheme, Hess misrepresented her business's affiliation with Donor Alliance, Inc. which was a legitimate, non-profit organ procurement organization in Colorado. PSR, ¶ 37.   By deceptively affiliating her business with a reputable organization, Hess gained unjustified credibility for her operations.   In another instance, Hess instructed a subordinate employee to make false claims in marketing presentations that body parts donated through Donor Services had helped the blind to see and a soldier to walk again when none of this was true. PSR, ¶ 37. Hess's directive to an employee urging such employee to lie about the nature of her business is certainly an aggravating factor when considering Hess's conduct.

Similarly, Hess's purposeful structuring of her business operations in a manner designed to conceal the true nature of her criminal activity is also an aggravating factor. By combining funeral home services with body broker services, Hess ensured herself that she would always have a fresh supply of stolen bodies which she could later sell to

unwitting customers.   Using this innovative business structure, Hess was able to avoid law enforcement detection.   Hess's business practices were so pernicious that her offense conduct ultimately contributed to and prompted changes in Colorado laws[2] regarding funeral homes and crematories. PSR, ¶ 38.   Such new laws were designed to prevent some of the abuses which occurred in the present case.

Hess was undoubtedly the dominant driving force during the eight years that the fraud scheme operated.   Through her guile, she deceived hundreds of victims while staying one step ahead of the law using her lies and manipulations.   During this period, Hess was financially benefiting from the ill-gotten gains derived from stolen bodies. As a consequence for her egregious conduct, Hess has earned a substantial imprisonment sentence.

---

[2]  *See generally*, "Tragic cases prompt bill making it easier to inspect Colorado funeral homes, crematories", Colo. Public Radio Article by Matt Bloom (Feb. 9, 2022)
https://www.cpr.org/2022/02/09/montrose-funderal-homes-cremtories-inspection-legislation/

In 2018, Colorado law changed related to ownership interests of funeral homes or crematory owners.   In short, the law added a new prohibition which made it unlawful for anyone holding a direct interest in a crematory to also own a direct interest in a body broker operation (or an indirect interest with more than a ten-percent ownership stake in the body broker business). C.R.S. 18-135-301(3).

In 2020, Colorado law was changed as it relates to the penalty for the offense of "abuse of corpse"; whereas it was previously a class 2 misdemeanor, the law was amended making the offense a class 6 felony.   C.R.S. 18-13-101(2).

In 2022, Colorado law was changed so that it was made easier for regulators to inspect funeral homes or crematories across the state for potential health and ethical violations.   Specifically, the new law allows certain regulatory agencies the ability to enter a funeral home or crematory on their "own initiative or upon receipt of a complaint [from a customer]."   C.R.S. 12-135-401(3)(a).

*Seriousness of the Offense / Promote Respect for Law / Just Punishment*

Here, the Defendant's criminal conduct warrants a substantial prison sentence to account for the seriousness of the offense, to ensure that others have a healthy respect for the law, and to provide just punishment.   The Defendant's conduct by any measure was horrific and morbid.   Hess and Koch took advantage of numerous victims who were at their lowest point given the recent loss of a loved one.   The fragile emotional state of many of the victims during their bereavement cannot be overstated.   While the victims were emotionally vulnerable due to their gut-wrenching grief, the Defendant assisted her mother in carrying out the underlying fraud.

Hess was the leader and owner of the business and, therefore, she bears the brunt of the responsibility.   Instead of dutifully performing cremations for the recently deceased in a dignified manner – as was her contractual and moral obligation – the Defendant abused multiple corpses.   In doing so, she violated the sacred trust that the victims and the next of kin placed in her.   The Defendant participated in the ultimate indignity when she directed the dismemberment of the bodies and then sold the body parts to buyers knowing that such disposition was without the knowledge and consent of the victims.   As reflected in many of the victim statements to the Court, the Defendant's conduct caused untold emotional distress which will haunt many of the victims forever. By sentencing the Defendant to a lengthy prison sentence, the Court can provide some semblance of justice albeit imperfect.   A lengthy prison sentence will signal to others that the law must be respected and that individuals like the Defendant who decide to

violate society's basic norms will ultimately be accountable for their actions.

*Adequate Deterrence / Protect the Public*

As noted above, the Defendant's underlying fraud scheme abused the victims' trust and resulted in substantial financial losses for the victims as well as unjustified emotional trauma. Instead of using the victims' hard-earned money for promised cremations, the Defendant and Koch pocketed funds for their personal benefit while failing to provide funeral services. To compound the injury, the Defendants often sold the stolen remains to third parties for an even greater profit. To ensure general deterrence for like-minded fraudsters in the future, the Government requests that the Court impose the substantial imprisonment sentence of 188 months. Such a sentence will send the message to others that similar criminal conduct will be treated seriously by the law and that participation in such a scheme will inevitably result in meaningful prison time. There is a need for specific deterrence as it relates to Hess as she is 46 years old and maintains the ability to gain employment at a future time. To ensure that innocent members of the public are protected and the Defendant is prevented from returning to her deceitful business practices, the Court should impose a substantial imprisonment sentence.

*Provide Defendant Needed Educational Training, Medical Care or  
Other Correctional Treatment in Most Effective Manner*

The PSR does not point to any specific needs of the Defendant as it relates to educational or vocational training. The Defendant graduated from high school in Colorado and has some college education. PSR, ¶¶ 107-110. The Defendant's primary

occupation during adulthood has been in the funeral home business. However, she also has several years of experience in other business activity such as working as a veterinary technician and as an interior designer. PSR, ¶¶ 111-115. There is no indication that substance abuse is an issue for the Defendant. PSR, ¶ 105. It does not appear that the Defendant has any physical health conditions requiring special medication or a physician's care. PSR, ¶¶ 97-100. However, it appears that the Defendant does have ongoing needs related to her mental and emotional health. PSR, ¶¶ 101-104. In fashioning its sentence, the Court will need to be mindful of these various issues. Further, the Court also has the ability to make a recommendation related to designation to a U.S. Bureau of Prison facility which appears most suitable for the Defendant's circumstances.

*Need to Avoid Unwarranted Sentencing Disparities Among Defendants Who Have Been Found Guilty of Similar Conduct*

Conducting a meaningful disparity analysis between Hess and other similar defendants is of limited value given the paucity of reported cases involving defendants engaging in similar conduct. Here, the Government conducted a canvas of the federal reporter looking for similar cases but was unable to find any congruent ones. However, one case worthy of note was *United States v. Rathburn*, 771 Fed. Appx. 614 (6th Cir. 2019) (unpublished). *See also* PSR, ¶ 43 (discussion of *Rathburn* case also referred to as "Death Harvester investigation"). In *Rathburn*, the defendant rented out human bodies and body parts that tested positive for HIV and hepatitis B to unsuspecting medical professionals. *Id.* at 617. The defendant legitimately obtained

donated cadavers and body parts from other companies. *Id.* at 618.   Despite *Rathburn's* explicit assurances to his customers, *Rathburn* obtained anatomical specimens that tested positive for infectious diseases for discounted prices and supplied them to his customers, while concealing the positive test results. *Id.*   Following a jury trial, *Rathburn* was convicted of seven counts of wire fraud and one count of illegal transportation of hazardous material. *Id.* at 617.   The Court sentenced *Rathburn* to 108 months imprisonment. *Id.*

Although there are similarities between the two cases, the facts on balance are more egregious in the underlying matter.   First, the sheer number of victims in the present scheme – over 500 - was substantially greater than the approximately 142[3] remains involved in *Rathburn*. PSR, ¶ 54.   Second, Hess and Koch used their funeral home at times to essentially steal bodies and body parts using fraudulent and forged donor forms.   *Rathburn* in contrast was selling and shipping infected body parts but there is no indication that he initially obtained the body parts using fraud or deceit.   Third, both fraud schemes occurred over a protracted period of time:   8 years (2010 to 2018) in the present case, and 13 years (2000 to 2013) in *Rathburn*. PSR, ¶ 54.   Fourth, in both cases the defendants were jeopardizing the safety of others by improperly shipping hazardous materials. PSR, ¶ ¶ 17, 18, 39.   Finally, Hess and Koch were doubling their profits by collecting victims' funds for non-existent cremations while

---

[3] The Court in *Rathburn* never explicitly identified the total number of victims but the PSR ¶ 54 provides such information.

simultaneously selling human remains out of the "back door" of their business for additional profits.    Stated differently, Hess and Koch's greed in the present case appears greater in magnitude when compared to *Rathburn*.

In summary, other than *Rathburn*, there appears to be a dearth of cases with a similar fact pattern as the present one.    The macabre nature of the underlying offense along with the Defendants' calculating and callous manner in which they carried it out makes it a unique outlier, with few other cases for comparison.   Consequently, the Government's recommended sentence would not result in a disparate outcome as there is a lack of similarly situated defendants from which to make a meaningful comparison. Ultimately when fashioning its sentence in the present matter, the Court will necessarily need to consider the various aggravating factors which make the criminal conduct so unique.

*Need to Provide Restitution to Any Victims of the Offense*

As noted above, there are multiple victims who suffered substantial pecuniary harm as a result of the Defendant's scheme.    At sentencing, the Court is required to take into account the need to provide restitution[4] to the victims which necessarily includes considering a defendant's ability to make repayment.    During the duration of any period of imprisonment, Hess's ability to make restitution payments will be minimal

---

[4]  In a separate pleading [#256] filed pursuant to 18 U.S.C. § 3664(d)(5), the Government requested that the Court schedule a separate restitution hearing within 90 days after sentencing for a final determination of the victims' losses. The Court granted this request and a hearing is set for March 6, 2023.

or non-existent. While the Defendant may urge at sentencing that she be given a shorter prison sentence so that she may begin making restitution payments earlier, such a request must be considered in light of the realities of her circumstances. Indeed, given the Defendant's limited earning potential, age, and current financial condition, it appears that the Defendant's ability to make meaningful restitution payments in the future will be limited. PSR, ¶ ¶ 117-125. Notably, the Defendant is facing massive liability based from judgments obtained against her in related civil litigation. PSR, ¶ 120. Accordingly, it is essential that a substantial imprisonment sentence be imposed to ensure that the other important sentencing factors discussed above (e.g. deterrence, punishment, respect for the law) are fully taken into account.

WHEREFORE, the Government requests that the Court sentence the Defendant to 188 months of imprisonment.

Respectfully submitted this 19th day of December, 2022.

        COLE FINEGAN
        United States Attorney

        By: *s/ Tim Neff*
        Tim Neff
        Assistant United States Attorney
        United States Attorney's Office
        1801 California Street, Suite 1600
        Denver, Colorado 80202
        Telephone: (303) 454-0100
        Fax: (303) 454-0405
        E-mail: Tim.Neff@usdoj.gov .
        Attorney for the Government

BY: *s/ Rebecca Weber*
Rebecca Weber
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0405
E-mail: rweber@usa.doj.gov
Attorney for the Government

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of December, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this case.

s/ *Amy McDaniel*
Amy McDaniel
Legal Assistant
U.S. Attorney's Office